IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| GREAT DIVIDE INSURANCE COMPANY, | ) | Civ. No. 05-00608 ACK-LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AOAO MALUNA KAI ESTATES, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION

In this case, Great Divide Insurance Company ("Great Divide") seeks a declaratory judgment that it does not owe a duty to defend or indemnify AOAO Maluna Kai Estates ("Maluna Kai"), a homeowners' association with a commercial general liability insurance policy issued by Great Divide, from an underlying claim brought by the family of a child who drowned in the swimming pool on Maluna Kai's premises.  Great Divide seeks the declaratory ruling based on a swimming pool exclusion to the insurance policy.

The Court held a bench trial on April 3-4, 2007.  The main issue at trial was whether, on the date of the drowning incident, the oceanside gate at the Maluna Kai pool area was self-locking, so that the swimming pool exclusion to the policy

did not apply to exclude liability coverage.  As discussed
herein, the Court finds that the oceanside gate was self-locking
at the time of the incident.

The Court makes the following findings of fact,
conclusions of law, and decision.  Where appropriate, findings of
fact shall operate as conclusions of law, and conclusions of law
shall operate as findings of fact.

**I.  Findings of Fact**

1.  AOAO Maluna Kai Estates ("Defendant" or "Maluna Kai")
is an unincorporated association of members who own certain
residential units located at or around 5045 Honoapiilani Road, in
the City of Lahaina, County of Maui, Hawaii.  See Stipulation of
Undisputed Facts at ¶1 (Mar. 6, 2007) ("Undisputed Facts").

2.  The real estate that comprises Maluna Kai is a
condominium complex consisting of ten single family homes
situated on approximately 2 acres of real property.  Id. at ¶4.

3.  A swimming pool is located near the rear of the
mountain-side homes of Maluna Kai.  Id. at ¶5.

4.  A five foot high rock wall surrounds the perimeter of
the swimming pool, and will be referred to herein as the
"swimming pool perimeter wall" or "perimeter wall".  Id. at ¶6.
The swimming pool perimeter wall encloses an area which contains
the following, in addition to the swimming pool: sun deck, sink,
counter space, two small rooms, barbecue grill, and lounge

2

chairs.  Id. at ¶6.  The area enclosed by the swimming pool perimeter wall will be referred to herein as the "swimming pool area."

5.    At all relevant times, there were two locations in the swimming pool perimeter wall where entrance/exit ways had been built to provide access in and out of the swimming pool area. Id. at ¶7.  At all relevant times, black metal gates consisting of vertical bars, 4 inches apart hung at the two entrance/exit ways to the swimming pool area.  Id. at ¶8.

6.    One gate to the swimming pool area is located at the edge of the section of the swimming pool area that faces the ocean.  Id. at ¶9.  This gate is referred to herein as the "oceanside gate" and is at issue in this trial.

7.    The other gate to the swimming pool area is referred to herein as the "cabana gate" Id. at ¶10.  The cabana gate is not at issue in this trial.

8.    Since November 2002, David Gerlach, Sr., of Insurance Associates, Inc., has been Maluna Kai's exclusive agent for obtaining insurance.  Id. at ¶11.[1]

9.    Great Divide Insurance Company ("Plaintiff" or "Great

---

[1]Gerlach testified that he believes that he is an agent for both Maluna Kai and Great Divide and that he owes them both a fiduciary duty.  See Trial Transcript at 2-32, 2-40 - 2-41. Great Divide disputes that Gerlach is its agent; Gerlach acknowledged that he had no written agency agreement with Great Divide.  Id. at 2-39 - 2-40.

Divide") issued a commercial general liability policy to Maluna Kai for an initial policy period of November 23, 2002 to November 23, 2003.  Id. at ¶12.  In conjunction with issuance of the policy, a loss control inspection took place on February 7, 2003; the inspector did not make any recommendation regarding swimming pool gates.  See Trial Transcript at 2-47.

10.  The initial commercial general liability policy was renewed for two subsequent policy periods of November 23, 2003 to November 23, 2004 and November 23, 2004 to November 23, 2005. Id.  The original policy and the two policy renewals contain a swimming pool fencing conditional exclusion.  Id.

11.  The phrase "the Policy" refers herein to the commercial general liability policy, in effect from November 23, 2004 to November 23, 2005, issued by Great Divide to Maluna Kai with a policy number of GC402788.  See Exhibit 31.  The Policy limits of liability are as follows: $2 million general aggregate limit; $1 million limit to any one person or organization for personal and advertising injury; $1 million limit per occurrence; $5,000 limit for medical expense for any one person.  See Exhibit 31, Commercial General Liability Coverage Part Declarations.

12.  The Policy affords liability coverage via a form entitled "Commercial General Liability Coverage Form" (hereinafter "CGL Form").  See Exhibit 31.  The CGL Form states, in pertinent part:

[Section I.1.a.] We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

. . .

[Section I.1.b.] This insurance applies to "bodily injury" and "property damage" only if: (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; [and] (2) The "bodily injury" or "property damage" occurs during the policy period.

. . .

[Section V.3.] "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

. . .

[Section V.13.] "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

Exhibit 31, CGL Form.

13.   The Policy schedules and affixes a one-page endorsement entitled "Swimming Pool Fencing Conditional Exclusion" (hereinafter "Swimming Pool Exclusion" or "Exclusion").  <u>See</u> Exhibit 31, Schedule of Forms and Endorsements; Exhibit 32, Swimming Pool Fencing Conditional Exclusion.  That Exclusion states:

LIABILITY ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT

5

CAREFULLY.

**SWIMMING POOL FENCING CONDITIONAL EXCLUSION**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is **added** to Paragraph 2., Exclusions of Coverage (Section I - Coverages);

This insurance does not apply to "bodily injury", "personal and advertising injury" or medical payments arising out of the ownership, maintenance, operation or use of a swimming pool unless the swimming pool is fenced with a self-locking gate and meets or exceeds all local governing codes and regulations.

All other Terms and Conditions of this Insurance remain unchanged.

Exhibit 32, Swimming Pool Fencing Conditional Exclusion (emphasis

in original).  The Policy and/or Exclusion do not define "self-

locking gate."

    14.  For purposes of this trial, the parties agree that the

swimming pool, perimeter wall, and gates meet or exceed all local

governing codes and regulations, as referenced in the Swimming

Pool Fencing Conditional Exclusion.  See, e.g., Trial Transcript

at 1-122 - 1-123 (Plaintiff's counsel agreeing that the

regulations were not an issue in this trial).

    15.  On and between approximately June 27, 2005 and July 15,

2005, Michelle and Faith Rogers visited Frank and Gladys Smirke,

residents of Maluna Kai, unit #6.  See Undisputed Facts at ¶20.

Faith was Michelle's two-year old daughter.  Id.

6

16.   On July 14, 2005, Faith Rogers drowned in the swimming pool of Maluna Kai.  Id. at ¶21.  She was unattended at the time of the drowning and there were no witnesses who saw her enter the pool area or the pool.  Id.  Rescue personnel arrived but could not revive her.  Id.  She was pronounced dead shortly after the arrival of rescue personnel.  Id.  The drowning will be referred to herein as "the incident."

17.   The Rogers family, through their attorney, has contacted Great Divide directly and has made claims against Maluna Kai arising from the incident.  Id. at ¶23.  Maluna Kai has requested that Great Divide defend and indemnify the Maluna Kai association concerning said claims.  Id.

18.   On August 22, 2005, Great Divide sent Maluna Kai a letter in which Great Divide reserved its rights with respect to the Rogers' claim.  See Exhibit 107.  In the letter, Great Divide stated, "our initial investigation has revealed the swimming pool fence and self-closing / latching gate may not have been operable on the date of the loss."  Id. at 1.  Great Divide went on to state that "[i]n the event it is determined the [Maluna Kai] swimming pool's self-locking gate was not operable on the date of the drowning, coverage may not be available for this loss."  Id. at 3.

19.   No evidence indicates that Great Divide notified Maluna Kai of any potential deficiency in the swimming pool perimeter

7

wall or gates until after the incident.

20.   In the instant lawsuit, Great Divide seeks "a judicial determination of the respective rights and obligations of Great Divide and [Maluna Kai]" under the Policy.  See First Amended Complaint at 14 (Apr. 11, 2006).  Great Divide seeks a declaration that it owes no duty to defend or indemnify Maluna Kai for the Rogers' claims, based on Great Divide's allegation that Maluna Kai did not maintain "functioning self-locking, self-latching, or self-closing gates" at the time of the drowning. Id. at 10, 14-15.

21.   At the time of the incident on July 14, 2005, the oceanside gate was not equipped with a lock that required a key, keycard, or entry of a pin number into a keypad.  This finding is supported by the video and pictures taken after the incident and the testimony of Kent Knowley, the president of the Maluna Kai homeowners' association.  No contradictory evidence was introduced.

22.   At the time of the incident on July 14, 2005, the spring mechanism on the oceanside gate was not functioning to automatically close the gate from an open position.  This finding is strongly supported by the video taken after the incident and the testimony of Vince Lamonica and James Williams, and to a lesser extent, by the testimony of Michelle Rogers and Frank Smirke.  This finding is not supported by the testimony of Kent

Knowley.

a.   The video of the oceanside gate, taken on July 24, 2005, shows the condition of the gate approximately ten days after the incident.  See Exhibit 30.  In the video, the oceanside gate did not close automatically from an open position.  Rather, when in an open position, it appeared that the oceanside gate had to be manually pulled or pushed into a closed position.  Although this video was taken after the incident, the testimony indicated that no repairs or changes were made to the oceanside gate between the time of the incident and the date of the video; therefore, the video is strong (but not dispositive) evidence of the condition of the oceanside gate at the time of the incident.

b.   Vince Lamonica, owner of Blue Tropix Pool Service, Inc., was called as a witness for Great Divide; he serviced Maluna Kai's pool weekly from 2001 through the time of the trial. See Trial Transcript at 1-20 - 1-21.  He customarily used the oceanside gate to enter and exit the pool area.  Id. at 1-25.  He testified that when he would arrive at the oceanside gate, it was in an open position more often than not.  Id. at 1-27.  When he was finished servicing the pool for the day, he would push the gate closed; it did not close automatically.  Id. at 1-26 - 1-27.

c.   James Williams is an expert in pool construction and design and pool enclosures, retained by Great Divide.  See Trial Transcript at 1-121.  He testified that the method by which

9

the external spring was mounted on the oceanside gate would not
provide adequate tension upon opening the gate to ensure that the
gate would automatically close and close tightly.  Id. at 1-123;
see also id. at 1-126.  His opinion was that the nature of the
external spring did not have the ability to assure self-closing
of the gate once open.  Id. at 1-130.

        d.   Michelle Rogers, mother of the deceased, testified
in her deposition that on each of the three occasions that she
went to the Maluna Kai pool in 2005, the oceanside gate was open
"all the way," so that you would not need to move the gate in
order to walk through it.  See Trial Transcript at 1-52, 1-55, 1-
57 - 1-58.

        e.   Frank Smirke, great-uncle of the deceased and
resident of Maluna Kai, testified that the return spring on the
oceanside gate was stretched out, and was not in any condition to
bring the gate back to meet the locking mechanism.  See Trial
Transcript at 2-11; see also id. at 2-19.  Smirke's testimony in
general, however, lacks credibility because it appeared self-
serving and his demeanor did not exude believability.  Moreover,
he flip-flopped about how often he had looked at the oceanside
gate up close.  First he testified that he observed the gate up
close three or four times in total.  Id. at 2-9.  He agreed that
he had not seen the gate up close for approximately 12 months
prior to the incident.  Id. at 2-21.  Then he changed his

testimony, saying that he might have seen the gate in the week prior to the incident and that he had gone to see the gate a few additional times prior to the incident just to see if it had been repaired.  Id. at 2-22 - 2-23.  Overall, Smirke's testimony was not very credible and the Court gives it little weight.

   f. The testimony of Kent Knowley, president of the Maluna Kai homeowners' association, was inconsistent with all the other evidence on this issue of whether the oceanside gate would close automatically from an open position.[2/]  Knowley testified that each time he used the gate, it would swing closed by itself. See Transcript at 1-88.  However, he testified that sometimes the wind, high grass, or some other obstacle could keep the gate from closing automatically.  Id. at 1-87 - 1-88.  Given the abundance and strength of the evidence that the gate would not close automatically - specifically the video and testimony of Lamonica and Williams, the Court finds Knowley's testimony that the gate would close automatically to be far outweighed by the evidence to the contrary.

  23. At the time of the incident on July 14, 2005, the oceanside gate was functioning to self-latch when closed, and to remain in a latched position until the latch was manually

---

[2/]Knowley purchased Maluna Kai Unit 1 in May 2003.  See Trial Transcript at 1-70.  In 2003, he resided there part-time, only spending two to three months of the year there.  Id. at 1-71.  He spent the majority of 2004 there and became president of the Maluna Kai homeowners' association in May 2004.  Id.

released.  This finding is strongly supported by the video taken after the incident and the testimony of Kent Knowley and Vince Lamonica.  This finding is also supported by the testimony of James Williams.  This finding is not supported by the testimony of Frank Smirke, Michelle Rogers, or David Gerlach (who had not observed the oceanside gate for over a year and who believed it had subsequently been repaired).

a.   In the video, taken on July 24, 2005, the oceanside gate latched into a secure position, so that it could only be unlatched manually, using (for example) a finger.  See Exhibit 30.  The oceanside gate had to be manually closed in order to latch, but once the gate was closed, the latching occurred automatically.  Id.  The video (and pictures taken the same day as the video) show that there were rocks missing from the perimeter wall adjacent to the oceanside gate and that the strike pin in the oceanside gate was bent.  See Exhibits 30, 39-40; see also Exhibit 38 (photograph of oceanside gate identifying the strike plate, bolt, latch, and strike pin).  Although the video was taken after the incident, the testimony indicated that no repairs or changes were made to the oceanside gate between the time of the incident and the date of the video; therefore, the video is strong (but not dispositive) evidence of the condition of the oceanside gate at the time of the incident.

b.   Knowley testified that on the evening before the

12

incident, he adjusted the oceanside gate and latched it.  See

Trial Transcript at 1-113.[3]  He stated that when he left the

oceanside gate around 6:30 p.m. on July 13, 2005, the latch was

operating properly.  Id.  Knowley also testified, albeit somewhat

inconsistently, that if you were to push the oceanside gate

closed (like you were closing a door), then the oceanside gate

would always latch.  Id. at 1-110.  Prior to that response, he

had stated that the gate could at times close by itself but fail

to latch.  Id. at 1-88 - 1-89.[4]  However, when the Court asked

him to clarify what he meant, Knowley explained that if the

oceanside gate were pushed closed, it would always latch:

> THE COURT: You - you testified earlier that the gate
> was self-closing.  And if I understood you correctly,
> you said it would self-close and sometimes it would
> self-latch and sometimes it wouldn't.
> THE WITNESS: It - it would depend on - it would always
> latch if the gate was brought to the latch.  Sometimes,
> depending if the lawn was high or if the wind was
> blowing or something, the closing mechanism wouldn't
> bring it by itself far enough to latch.  But if you
> pushed it like you were closing a door, then it would
> always latch.

Id. at 1-110.  Overall, Knowley's testimony indicates that: (1)

although rocks were missing from the perimeter wall adjacent to

---

[3]Knowley periodically made adjustments to the strike pin on
both the oceanside gate and the cabana gate.  See Trial
Transcript at 1-108 - 1-109.  When the strike pin was in need of
adjustment, according to Knowley, the latch would still hold the
gate in place if the gate were closed.  Id. at 1-109 - 1-110.

[4]Knowley went on to say that because some rocks were
missing from the perimeter wall, the strike plate could "jiggle",
which did not affect it very much.  Id. at 1-90.

the oceanside gate, the strike pin could get bent if the gate was
slammed, and the strike plate could jiggle, the oceanside gate
always latched on its own if the gate was manually pushed closed
in the way that one would push a door closed, and (2) at 6:30
p.m. on the evening before the incident, the oceanside gate was
functioning such that when closed, it would latch and stay
latched until manually released.  Knowley's observation of the
oceanside gate at 6:30 p.m. on the evening before the incident is
the eyewitness account closest in proximity to the time of the
incident.  Moreover, Knowley's credibility regarding the
condition of the oceanside gate on the night before the incident
is bolstered by the corroborating evidence, namely the video and
testimony of Lamonica and Williams.

     c.   Lamonica testified that, in his weekly visits to
the pool for the four years leading up to the incident, when he
would push the oceanside gate closed, the oceanside gate would
latch.  See Trial Transcript at 1-27 - 1-28, 1-43 - 1-44.[5/]
According to Lamonica, this latching would take place despite the
rocks missing from the perimeter wall and despite the fact that

--------

[5/]Lamonica's opinion that the gate was not "automatically
latching" or "self-latching" is not significant, given that
Lamonica could have any number of interpretations of those
phrases, such as meaning the gate would not both automatically
close and latch.  See Trial Transcript at 1-26, 1-43.  What is
important is that he testified repeatedly that whenever he would
push the gate closed, it would latch.  See Trial Transcript at 1-
27 - 1-28, 1-43 - 1-44.

the strike pin on the oceanside gate was bent.  Id. at 1-32 - 1-34.[6]

   d.   Williams, Great Divide's expert, testified that the picture of the oceanside gate taken ten days after the incident demonstrates that if the gate were closed, the latch would keep the gate closed until the latch was manually released. See Trial Transcript at 1-133; see also Exhibit 23.  Williams testified that the bolt on the oceanside gate was bent, but that - as shown in the picture - the latch would secure the gate in a closed position despite the bent bolt.  Id. at 1-134 - 1-135. Williams also testified that there was a possibility - not reflected in the picture - that the oceanside gate would close but that the latch would not secure if the strike pin and latching device were not positioned properly.  See id. at 1-131 - 1-132.  However, Williams then admitted that the picture reflects that if the gate was closed, the latching device would keep the gate closed until manual release.  Id. at 1-133.

   e.   Smirke testified that the oceanside gate would never latch because the strike pin was always, in his experience, in a downward position.  See Trial Transcript at 2-15 - 2-16, 2-

_____

   [6]Lamonica confirmed that the pictures taken approximately ten days after the incident - taken on the same day as the video - depict the oceanside gate, latch, and adjacent perimeter wall in the same condition that they were in during the month prior to the incident.  See Trial Transcript at 1-32 - 1-33, 1-35 - 1-36, 1-39; Exhibits 23, 25, 27.

18.   Smirke testified that he told Knowley that the oceanside gate "would not lock" and that Knowley acknowledged his concern and said that it was going to be taken care of.  Id. at 2-20. The Court finds, as discussed supra, that Smirke's testimony was not credible and deserves little weight.  Moreover, the video as well as the testimony of Knowley, Lamonica, and Williams indicate (contrary to Smirke's testimony) that the gate would automatically latch when closed even though the strike pin was bent into a downward position.

f.   Michelle Rogers testified in her deposition that in her three visits to the pool prior to the incident, the gate would not latch properly because when she "tried to pull the latch over the rusted screw, it would not latch over it."  See Trial Transcript at 1-60.  Rogers testified that she had never seen the oceanside gate in a latched position.  Id. at 1-67.

g.   David Gerlach testified that in January 2003, "you actually had to lift the [oceanside] gate up or almost lift the gate up in order to latch it".  See Trial Transcript at 2-45. However, Gerlach testified that he believed, based on a loss control inspection in February 2003, that subsequently the oceanside gate was functioning and working correctly; Gerlach did not observe the oceanside gate himself after January 2003 and could not personally attest to its condition closer in time to the July 2005 incident.  See id. at 2-46 - 2-48.  Given the

16

remoteness in time of Gerlach's observation of the oceanside gate, his testimony is much less persuasive than the video and the testimony of Lamonica, Knowley, and Williams.  Moreover, Gerlach's other testimony does not assist the Court in determining the condition of the oceanside gate's latching mechanism at the time of the incident.  For example, Gerlach testified that he received information from Knowley or Knowley's wife on the date of the incident that the pool gate was unlatched.  See Trial Transcript at 2-34 - 2-37; see also Exhibits 10 and 12.  However, whether the gate was unlatched does not assist the Court in determining whether the oceanside gate would latch automatically if pushed closed, because it could simply mean that the gate was not pushed closed.  Similarly, that a claims adjuster for the insurance company told Gerlach that the gate was defective and Maluna Kai has some liability does not assist the Court in determining whether the oceanside gate would latch automatically if closed.  See Trial Transcript at 2-34 - 2-36; see also Exhibit 19.

    h.   The evidence demonstrates that the oceanside gate was in poor condition at the time of the incident - rocks were missing from the perimeter wall adjacent to the gate, the strike plate was loose as a result of the missing rocks, the strike pin was bent, and the Maluna Kai homeowners' association board of directors had recognized that the oceanside gate suffered from

17

poor construction, damage and needed repair.[7/]   Despite its poor condition, a preponderance of the evidence demonstrates that the oceanside gate was functioning to latch automatically when closed, and to remain in a latched position until the latch was manually released.   The video and the testimony of Knowley, Lamonica, and Williams outweigh any contradictory evidence.

24.   Williams, the expert in swimming pool construction and design and pool enclosures, testified that: "A self-closing gate is one that does not require manual assistance in order to be closed and closed tightly.   Self-latching is upon the closure of the gate that it can be latched in a secure condition and require

---

[7/]In general, the minutes indicate that the oceanside gate needed repair, but nothing in the minutes indicate that the gate would not latch automatically when closed.   Minutes from the July 11, 2002 Maluna Kai homeowners' association board of directors meeting state that "Recent damage to the pool gate from misuse and poor original construction will be repaired as soon as possible since the non=closing [sic] gate to the pool area constitutes a liability exposure to homeowners."   Exhibit 1. Minutes from the May 19, 2004 homeowners' association meeting state: "A discussion of pool cabana, gates and locks was held. Knowley will repair the rock work around the pool gates in June when he returns.   Henry will have the locks installed.   The locks to the pool gates and the cabana bathroom will be keyed the same as the walking gate at the entrance."   Exhibit 8.   Minutes from the March 8, 2005 homeowners' meeting state: "A bid will be acquired on . . . repairs to the Pool gate so a proper closing gate can be applied."   Exhibit 9.   It is not clear that any repairs were made to the rock wall or oceanside gate prior to the incident, other than Knowley's periodic adjustments to the strike pin.   See Trial Transcript at 1-32 - 1-33 (Lamonica testimony that he is unaware of any repairs), 1-91 - 1-93 (Knowley testimony that he is not aware of any particular repairs); but see id. at 2-46 -2-48 (Gerlach testimony that he thought repairs had been made).

manual opening for the gate to be reopened."  Trial Transcript at 1-122 - 1-123.  Williams went on to testify that a gate that is manually closed and has a latch that self-latches as soon as the gate is closed is a "self-latching gate."  Id. at 1-136.  And agreed that "self-latching can mean both, number one, when the gate automatically closes and it self-latches, or secondly, when the gate is manually closed and it self-latches."  Id. at 1-137.

## II.  Conclusions of Law

1.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 2201(a).  See American States Ins. Co. v. Kearns, 15 F.3d 142, 143 (9th Cir. 1994).  Complete diversity exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.  See 28 U.S.C. § 1332; Kearns, 15 F.3d at 143.  The Rogers family has made claims against Maluna Kai arising from the incident; the Policy limit is over $75,000; Great Divide has reserved its rights with respect to its duties to defend and indemnify Maluna Kai from the Rogers' claims.  Courts "have consistently held that a dispute between an insurer and its insureds over the duties imposed by an insurance contract satisfies Article III's case and controversy requirement." Government Employees Ins. Co. v. Dizol, 133 F.3d 1220, 1223 n.2 (9th Cir. 1998) (en banc).  "[A] declaratory judgment action is appropriate 'when the judgment will serve a useful purpose in

clarifying and settling the legal relations in issue, and . . .
when it will terminate and afford relief from the uncertainty,
insecurity, and controversy giving rise to the proceeding.'"
Penn-America Ins. Co. v. Coffey, 368 F.3d 409, 412 (4th Cir.
2004) (citations and internal quotation marks omitted).  Exactly
such a useful purpose will be served here.  This case presents a
justiciable "case or controversy," despite the fact that an
underlying lawsuit has not yet been filed by the Rogers' family,
since the Rogers' family has asserted a claim against Maluna Kai
and the filing of a lawsuit by the Rogers' family appears
imminent.  See Aetna Cas. & Sur. Co. v. General Dynamics Corp.,
968 F.2d 707, 711 (8th Cir. 1992) (determining that justiciable
controversy existed in declaratory judgment action brought by
insurer to determine whether it had a duty to defend and
indemnify insured, where no lawsuits had yet been filed with
respect to four environmental sites but letters demanding clean
up of those sites had been served on insured, insured made
demands of defense to insurer, and insurer disputed the demands
of defense); Firemen's Ins. Co. of Wash. v. Kline & Son Cement
Repair, Inc., 474 F. Supp. 2d 779, 783-88 (E.D. Va. 2007)
(determining that justiciable case or controversy existed in
declaratory judgment action brought by insurer to determine
whether it had a duty to defend and indemnify insured, where
third party had made a claim against insured but had not filed a

20

lawsuit; concluding that the majority of jurisdictions to address
the issue have found that a third party's failure to file an
underlying lawsuit is not a <u>per se</u> barrier to the maintenance of
a declaratory judgment action by an insurer against its insured);
<u>T.H.E. Ins. Co. v. Dowdy's Amusement Park</u>, 820 F. Supp. 238, 240
(E.D. N.C. 1993) (determining that actual case or controversy
existed in declaratory judgment action brought to determine
whether an insurer had a duty to defend the insured, even though
no complaint against the insured had yet been filed); <u>see also</u>
Undisputed Facts ¶ 23.[8]

    2.   The Court concludes (and the parties agree) that -
balancing concerns of judicial administration, comity, and
fairness to the litigants - it is appropriate for the Court to
exercise its discretionary powers to entertain this action

_____

    [8]<u>See also</u> Edwin Borchard, <u>Declaratory Judgments</u> 636-37 (2d
ed. 1941) (noting that "even a potential claim, such as the
probable claim of an injured person against the insured and the
insurance company, is sufficient to cause fear and jeopardy and
thus to warrant the institution of an action for a declaration of
nonliability"); Allison E. Butler, 22-144 <u>Appleman on Ins. 2d</u> §
144.2[A][2][a] ("A litigant seeking a declaration of
nonliability, or limited liability, has a cause of action for
judicial relief.  Thus, the probable claim of an injured person
against the insured and insurer is sufficient to cause jeopardy
and thus to warrant commencement of an action for a declaration
of no liability.  Although a claim may be contingent, in the
sense that it has not yet been brought, when facts and
circumstances indicate that it is likely to be brought, there is
justification for making the injured person, who has a 'real and
substantive though not immediate' interest, a party-defendant in
an action for a declaration that the insurer is not liable under
the policy.") (internal footnotes omitted).

21

seeking declaratory relief pursuant to 28 U.S.C. § 2201.  <u>See</u> <u>Kearns</u>, 15 F.3d at 143-44.

3.   The Court looks to the language of the insurance policy to determine the scope of the insurer's duty.  <u>Sentinel Ins. Co.,</u> <u>Ltd. v. First Ins. Co. of Hawaii, Ltd.</u>, 76 Haw. 277, 287, 875 P.2d 894, 904 (Haw. 1994).

4.   In Hawaii, the terms of an insurance policy are to be interpreted according to their plain, ordinary, and accepted sense in common speech, unless it appears from the policy that a different meaning is intended.  <u>See</u> <u>Burlington Ins. Co. v.</u> <u>Oceanic Design & Constr. Inc.</u>, 383 F.3d 940, 945 (9th Cir. 2004); <u>Dairy Rd. Partners v. Island Ins. Co., Ltd.</u>, 92 Haw. 398, 411, 992 P.2d 93, 106 (Haw. 2000).  The policy must be interpreted according to the entirety of its terms and conditions.  <u>See</u> Haw. Rev. Stat. § 431:10-237 ("Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, restricted, or modified by any rider, endorsement or application attached to and made a part of the policy"); <u>see also</u> <u>Burlington</u> <u>Ins. Co.</u>, 383 F.3d at 945; <u>Dairy Rd. Partners</u>, 92 Haw. at 411.

5.   In Hawaii, "because insurance policies are contracts of adhesion and are premised on standard forms prepared by the insurer's attorneys, we have long subscribed to the principle that they must be construed liberally in favor of the insured and

any ambiguities must be resolved against the insurer." <u>Tri-S Corp. v. Western World Ins. Co.</u>, 110 Haw. 473, 489, 135 P.3d 82, 98 (Haw. 2006) (quoting <u>Dairy Rd. Partners</u>, 92 Haw. at 411-12). In other words, policies must be construed in accord with the reasonable expectations of a layperson.  <u>Tri-S Corp.</u>, 110 Haw. at 489; <u>Dairy Rd. Partners</u>, 92 Haw. at 412.  The courts are "committed to enforce . . . '[t]he objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts.'"  <u>Sturla, Inc. v. Fireman's Fund Ins. Co.</u>, 67 Haw. 203, 210, 684 P.2d 960, 964 (Haw. 1984) (quoting Keeton, <u>Insurance Law Rights at Variance With Policy Provisions</u>, 83 Har. L. Rev. 961, 967 (1970)).[9/]

6.    A policy provision is not ambiguous just because the insurer and insured disagree over the interpretation of the terms of a policy.  <u>See</u> <u>Oahu Transit Servs., Inc. v. Northfield Ins. Co.</u>, 107 Haw. 231, 236 n.7, 112 P.3d 717, 722 n. 7 (Haw. 2005)

---

[9/]The Court declines to adopt Washington State law, relied on by Great Divide, to interpret an insurance policy in Hawaii since ample, recent case law from the Hawaii Supreme Court is directly relevant.  <u>See</u> <u>Sentry Select Ins. Co. v. Royal Ins. Co. of America</u>, - F.3d -, 2007 WL 1029787 at *11 (9th Cir. Apr. 6, 2007) (applying Washington State law to determine that where the terms of an insurance policy are ambiguous, the court should examine the parties' intent as evidenced by extrinsic evidence, including evidence of the relationship of the parties, preliminary negotiations, usages of trade, and course of dealings).  Moreover, the Court notes that Great Divide itself sought to keep much of this evidence from being presented at trial through a motion in limine to exclude evidence of waiver and estoppel, which the Court granted.

(quoting <u>Hawaiian Ins. & Guar. Co., Ltd. v. Chief Clerk of First Cir. Ct.</u>, 68 Haw. 336, 341, 713 P.2d 427, 431 (1986)).  Ambiguity exists only when the policy "taken as a whole, is reasonably subject to differing interpretation."  <u>Oahu Transit Servs.</u>, 107 Haw. at 236 n.7 (quoting <u>Hawaiian Ins. & Guar. Co., Ltd.</u>, 68 Haw. at 341).  If the policy is reasonably subject to differing interpretation, the ambiguity must be resolved against the insurer.  <u>Id.</u>; <u>see also</u> <u>Tri-S Corp.</u>, 110 Haw. at 489.

    7.   Here, the Policy contains an exclusionary clause: the Swimming Pool Exclusion.  The Swimming Pool Exclusion contains an exception for, <u>inter alia</u>, a swimming pool fenced with a self-locking gate.  The burden shifts between Plaintiff and Defendant with respect to proving facts that apply to bring the Rogers' claim under the Policy, the Swimming Pool Exclusion, and the exception to the Swimming Pool Exclusion, as follows.

    8.   Maluna Kai bears the initial burden of proving by a preponderance of the evidence that the Rogers' claim falls within the Policy.  <u>Sentinel Ins. Co., Ltd.</u>, 76 Haw. 277, 292 n. 13; <u>Allstate Ins. Co. v. Takeda</u>, 243 F. Supp. 2d 1100, 1104 (D. Haw. 2003).  Great Divide has conceded and the Court concludes that the Rogers' claim falls within the Policy.  <u>See</u> Transcript of Proceedings on Various Motions at 14-15 (Mar. 29, 2007).

    9.   Maluna Kai having satisfied its initial burden, the burden shifts to Great Divide to prove facts that bring the claim

within the exclusionary clause of the Policy.  See Quinn v. Wilshire Ins. Co., 53 Haw. 19, 21, 486 P.2d 59, 60 (Haw. 1971); Allstate Ins. Co., 243 F. Supp. 2d at 1104.  Great Divide has proven that the Rogers' claim falls within the Swimming Pool Exclusion because Great Divide has presented a preponderance of evidence that the Rogers' claim stems from bodily injury to Faith Rogers arising out of the ownership, maintenance, operation and/or use of the swimming pool on the Maluna Kai property. Maluna Kai introduced no conflicting evidence and has conceded this issue.  See Trial Transcript at 2-58.

10.  Great Divide having satisfied its burden, the burden shifts back to Maluna Kai to prove that the exception to the Swimming Pool Exclusion applies to restore coverage under the Policy.  See 17A Couch on Ins. § 254:13 (3d ed. 2006) ("There is some uncertainty concerning the proper allocation of the burden of proof as to the applicability of an exception which, in effect, restores the coverage taken away by the exclusion.  The trend clearly appears, however, to place the burden on insureds to prove that an exception to an exclusion applies to restore coverage."); Aeroquip Corp. v. Aetna Casualty and Surety Co., Inc., 26 F.3d 893, 894-95 (9th Cir. 1994) (under California law, burden is on insured to prove application of exception to exclusion).  Although Hawaii courts have not yet addressed this issue of whether the insured or the insurer bears the burden of

proving the applicability of an exception to an exclusionary clause, this Court finds that Hawaii courts would place that burden on the insured.  First, this rule is consistent with the view that the burden should follow the benefit.  See 17A Couch on Ins. § 254:13.  Second, this rule is consistent with the view that the burden is to be placed on the party with the best access to the information that will be required to carry the burden. See id.  Third, this rule is followed by California courts, to which Hawaii courts look for precedent on issues that have not been addressed under Hawaii case law.  See Aeroquip Corp., 26 F.3d 893, 894-95 (under California law, burden is on insured to prove application of exception to exclusion); American States Ins. Co. v. Sacramento Plating, Inc., 861 F. Supp. 964, 968-69 (E.D. Cal. 1994) (same); see also Locricchio v. Legal Services Corp., 833 F.2d 1352, 1357 (9th Cir. 1987) ("general trend of Hawaiian courts is to look to California law in the absence of Hawaiian authority"); Sutherland v. Kaonohi Ohana, Ltd., 776 F.2d 1425, 1427 n.4 (9th Cir. 1985) ("courts of Hawaii frequently look to decisions from California when deciding cases of first impression").

11.  Maluna Kai has met its burden of proving facts that bring the Rogers' claim under the exception to the Swimming Pool Exclusion, thus restoring coverage under the Policy, as discussed below.

26

12.   The phrase "self-locking gate" contained in the exception clause to the Swimming Pool Exclusion is ambiguous. Taking the Policy as a whole, the phrase "self-locking gate" is reasonably subject to differing interpretation.   See Oahu Transit Servs., 107 Haw. at 236 n.7.

13.   As discussed in the Order Denying Plaintiff Great Divide Insurance Company's Motion for Summary Judgment, "it is not immediately clear what constitutes a 'self-locking gate.'" See Order Denying Plaintiff Great Divide Insurance Company's Motion for Summary Judgment at 11 (Sept. 27, 2006).   The order explained:

> While Great Divide argues that for a gate to be "self-locking" it must be equipped with a lock (requiring a key or access code to open), Maluna Kai argues that the word "lock" has multiple meanings depending on the specific context.   For instance, as Maluna Kai's counsel pointed out during the August 30 hearing, airplane tray tables are to be "locked" in their upright position during take off and landing.   On the other hand, "to lock a door" implies securing the door so that one would need a key or combination to open it. Each of the parties' interpretation of "lock" is consistent with the term's "accepted sense in common speech."   Burlington Ins. Co., 383 F.3d at 945.
>
> The parties' definitions of "lock" are also supported by the term's many dictionary definitions.   The Oxford English Dictionary defines the verb "lock," among various other definitions, as: "To fasten (a door, gate, box, drawer, etc.) with a lock and key"; and "to secure (a chamber, building, enclosure) by locking the doors"; and also "[t]o fix or join firmly by interlacing or fitting of parts into each other." Oxford Dictionary 1084-85 (2d ed. 1989).   The definition "to fasten . . . with a lock and key" aligns with Great Divide's interpretation, while another definition, to "fix or join firmly by interlacing or

27

> fitting of parts into each other," supports Maluna
> Kai's view.

Order Denying Plaintiff Great Divide Insurance Company's Motion

for Summary Judgment at 11-12.

    14.  The parties disagree over the application of "self" as

it is used in the phrase "self-locking."  A common definition of

"self" is "automatic [or] automatically."  <u>Oxford Dictionary</u> 912

(2d ed. 1989) ("In technical use, forming compounds to designate

machines, appliances, or processes by or in which certain

operations are performed without human or animal agency or

special manipulation or adjustment for the purpose; usually =

automatic, automatically.").  The parties do not dispute this

definition of "self," but they differ in their views of how that

prefix applies in the phrase "self-locking gate."  Under this

definition, a "self" locking gate could operate such that it

locks automatically (or by its "self") when it is closed.  Maluna

Kai agrees with this interpretation.  Alternatively, Great Divide

argues that a "self" locking gate must operate to <u>both</u> close

automatically and lock automatically.

    15.  Construing the Policy in accord with the reasonable

expectations of a layperson and resolving all ambiguity against

the insurer, the Court holds that the phrase "self-locking gate"

refers to a gate equipped with a mechanism that automatically

fixes or joins firmly by the interlacing or fitting of parts into

each other when closed, and remains in that fixed or joined

28

position until the mechanism is manually released.  To be a
"self-locking gate," a gate need <u>not</u> automatically swing into
closed position when released from an open position (in other
words, it need not be self-closing).[10/]  Nor does a "self-locking
gate" require a key, keycard, or entry of a pin number to release
the locking mechanism.  For example, a gate equipped with a
latch, that latches into a secure position automatically when the
gate is closed, and remains latched until the latch is manually
released, constitutes a self-locking gate.

16.  This interpretation of "self-locking" is consistent
with the Policy taken as a whole, including the exception
pertaining to the safety of a fenced swimming pool.  It gives
meaning to the prefix "self" contained in the ambiguous phrase by
requiring the locking mechanism to engage automatically when the
gate is closed.[11/]  Additionally, it is consistent with the
objectively reasonable expectation of a layperson and/or
beneficiary.

17.  Defendant has proven, by a preponderance of the
evidence, that the oceanside gate was a "self-locking gate" at

---

[10/]A gate, like a door, can be self-locking but not self-
closing.  For example, a door may lock automatically when it is
closed, but that door has to be manually closed - it does not
close on its own.  Such a door would be self-locking but not
self-closing.

[11/]For example, a gate that one closes and then manually
slides the latch to secure the gate in place would not be a
"self" latching gate.

the time of the incident.   <u>See</u> Finding of Fact ¶23.[12/]

18.   The Swimming Pool Exclusion does not exclude coverage for the claim arising from the incident because the exception to the Swimming Pool Exclusion was met: the swimming pool was fenced with a self-locking gate and meets or exceeds all local governing codes and regulations.

19.   The duty to defend and the duty to indemnify are separate and distinct.   <u>Tri-S Corp.</u>, 110 Haw. at 488 (quoting <u>Dairy Rd. Partners</u>, 92 Haw. at 412-13).   The duty to defend is broader than the duty to pay claims and arises whenever there is the mere potential for coverage - the duty to defend rests primarily on the possibility that coverage exists.   <u>Id.</u>   "All doubts as to whether a duty to defend exists are resolved against the insurer and in favor of the insured."   <u>Id.</u>

20.   Great Divide owes a duty to defend Maluna Kai from the Rogers' claim.

21.   Great Divide owes a duty to indemnify Maluna Kai from any liability incurred from the Rogers' claim, subject to the limits of the Policy.

22.   At the close of the evidence, the Court granted Plaintiff Great Divide's motion for judgment on partial findings under Federal Rule of Civil Procedure 52(c), under which Great

---

[12/]The condition of the cabana gate is not at issue in this trial.   Neither party has argued that the cabana gate was not a "self-locking gate."

Divide sought a ruling that Defendant Maluna Kai did not prove the affirmative defenses of waiver and estoppel.  As discussed orally, Defendant did not assert these affirmative defenses at trial and agreed (in the pretrial proceedings and with respect to Great Divide's motion in limine to exclude evidence of waiver and estoppel) to forego them.

23.  Pursuant to the findings of fact and conclusions of law made herein, the Court denies Plaintiff Great Divide's remaining motion for judgment on partial findings under Federal Rule of Civil Procedure 52(c), under which Great Divide seeks a finding that the oceanside gate was not fenced with a self-locking gate at the time of the incident.

## IV.  Decision

Great Divide owes a duty to defend and indemnify Maluna Kai from the Rogers' claim.

Defendant Maluna Kai is entitled to judgment on all counts.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 14, 2007.



Alan C. Kay
Sr. United States District Judge

Great Divide Ins. Co. v. AOAO Maluna Kai Estates, Civ. No. 05-00608 ACK-LEK, Findings of Fact, Conclusions of Law, and Decision.